**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TERATECH, CORP. d/b/a TERASON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| MINDRAY BIO-MEDICAL ELECTRONICS | ) | |
| CO. LTD. d/b/a MINDRAY GLOBAL and | ) | |
| MINDRAY DS USA, Inc. d/b/a MINDRAY | ) | |
| NORTH AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Teratech Corporation, d/b/a Terason ("Teratech" or "Plaintiff"), by and through its

undersigned counsel, complains and alleges against Defendants Mindray Bio-Medical Electronics

Co. Ltd. d/b/a Mindray Global ("Mindray Global") and Mindray DS USA, Inc. d/b/a Mindray

North America ("Mindray USA") (collectively "Mindray" or "Defendants") as follows:

## NATURE OF THE ACTION

1.      This is a civil action for infringement of U.S. Patent Nos. 11,675,073 (the "'073

Patent"); 12,102,480 (the "'480 Patent"); 11,857,363 (the "'363 Patent"); 12,115,023 (the "'023

Patent"), and 9,877,699 (the "'699 Patent") (referred to collectively as the "Asserted Patents")

arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

## THE PARTIES

2.      Plaintiff Teratech, the owner of all right and interest in the Asserted Patents, is a

corporation with a principal place of business at 77 Terrace Hall Avenue, Burlington, MA  01803.

3.     Upon information and belief, Defendant Mindray Global is a Chinese Corporation with a principal place of business at Mindray Building Keji 12th Road South High-Tech Industrial Park, Nanshan, Shenzhen 518057, P.R. China.

4.     Upon information and belief, Defendant Mindray USA is a Delaware corporation with a principal place of business at 800 MacArthur Blvd, Mahwah, NJ 07430.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

6.     This Court has personal jurisdiction over Defendant Mindray Global because Mindray Global does and has done substantial business in this judicial District, including (i) committing acts of patent infringement and/or contributing to or inducing acts of patent infringement by others in this judicial District and elsewhere in this State; (ii) regularly conducting business in this State and judicial District; (iii) directing advertising to or soliciting business from persons residing in this State and judicial District; and (iv) engaging in other persistent courses of conduct, and/or deriving substantial revenue from products and/or services provided to persons in this District and State.

7.     This Court has personal jurisdiction over Defendant Mindray USA because Mindray USA is a Delaware corporation that is headquartered in Mahwah, New Jersey. Thus, Mindray is at home in this District and subject to the general jurisdiction of this Court.

8.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Defendant Mindray Global is a foreign corporation subject to personal jurisdiction in this District and Defendant Mindray USA is a Delaware corporation.

ME1\57842116.v1

## BACKGROUND

9.      Plaintiff Teratech was founded in 1994 by Alice Chiang, PhD, a named inventor on the Asserted Patents, to design, build, and commercialize portable ultrasound products.  Dr. Chiang is now the inventor on more than 50 patents.  She holds a PhD in physics from the Virginia Polytechnic Institute and a BS in physics from the National Taiwan University.

10.     She started at MIT Lincoln Laboratory in 1976 working in microelectronics, where she remained until 1994.  At Lincoln Laboratory, Dr. Chiang was known for her fierce defense for women in STEM and was an active member of the Women's Forum and the Professional Women's Network.

11.     Importantly, Dr. Chiang was instrumental in developing new architectures which allowed charge-coupled devices ("CCDs") to operate at high speed and with enormous computation power.  She is a named inventor on 17 issued US patents that were filed by MIT during her time at MIT Lincoln Laboratory, including those using CCD technology for beamforming applications.

12.     At that time, high performance ultrasound imaging products were generally large, static systems that required many large circuit boards to mount the hardware needed to operate these systems.

13.     Around 1994, while at Lincoln Laboratory, Dr. Chiang began to explore the possibility of obtaining funding for the development of a "charge domain processor" semiconductor chip that could process a plurality of channels corresponding to each of the transducer elements of an array that would delay the signals from corresponding transducer elements of a medical ultrasound transducer.

14.     Such a design would dramatically reduce the size and the electrical power needed to perform the required beamforming operation for ultrasound imaging.  Her intent was to design

a system that could run on battery power in a small handheld processing unit. This would result in the first fully portable, high resolution ultrasound medical imaging system. An experimental processing chip with 10 delay channels was fabricated at MIT Lincoln Laboratory in 1994 to demonstrate the concept. Later that year, Dr. Chiang left Lincoln Laboratory to found Teratech.

15.     In 1995, ARPA issued a public request for proposals to develop a battery powered, high performance portable ultrasound system. Teratech submitted a proposal, and was ultimately awarded funding.

16.     The Teratech design was based on a beamformer chip design using a 32 channel charge domain processor in which, for example, four semiconductor chips were to be fabricated with each having 32 channels with integrated signal processing functions so that the analog signals generated by 32 transducers would be sampled and processed by a single chip to apply the necessary delays and processed to form ultrasound images using 128 channels. This design was ultimately commercialized as the Teratech Model 2000.

17.     The Model 2000 received FDA approval during July 2001 and used a commercial IBM laptop computer connected to one of several handheld transducers that were connected to a small portable housing, which held the beamformer electronics, that was connected to the IBM laptop that displayed ultrasound images. The beamformer received analog signals from different ultrasound transducers where the delays applied to each channel could be selected to provide a variety of imaging modes including B mode imaging, M mode imaging, and Doppler processing.

## TABLET ULTRASOUND PRODUCTS

18.     Even as recently as 2012, those using ultrasound imaging systems were still predominantly sonographers working in hospitals who had been trained in the earlier control features using specialized keyboards where trackballs, associated buttons, and sliding elements

4

were used to manipulate imaging operations on ultrasound imaging products. Sonographers at that time typically required extensive training to perform diagnostic ultrasound imaging using standardized radiological procedures and were accustomed to the manual control features on the specialized keyboards. Given the predominance of these control features at that time, there was initial resistance to even partial use of a touchscreen for performing ultrasound operations.

19.     The first use of touchscreens for ultrasound products was consequently limited in scope in connection with larger systems. Teratech  introduced a tablet ultrasound system that included all control functions on the touchscreen interface as well as numerous high performance features. These features included networked high speed communication for remote viewing and operation (telemedicine), DICOM compliant patient data management, and important diagnostic imaging and quantitative tools such as a full touch selected presets library, needle visualization,  cardiac ejection fraction measurements, split screen viewing of active ultrasound images and touch screen actuated beam steering, for example.

20.     Over many years of internal design and development, Teratech developed the elaborate software and firmware architecture to operate the system-on-chip ("SOC") beamformer with a touchscreen interface that further miniaturized and reduced the power consumption for a battery powered touchscreen tablet ultrasound imaging system in which the beamforming electronics were mounted integrally within the touchscreen tablet housing.

## THE PATENTS-IN-SUIT

21.     Asserted U.S. Patent No. 11,675,073, attached hereto at Ex. A, is generally directed to compact portable ultrasound systems that integrally included the beamforming circuitry within a touch screen display housing with a tablet form factor that provided a lightweight, high-resolution ultrasound device using components and methods that improve connectivity and ease

of use. The '073 Patent issued from U.S. Application No. 16,197,754, filed on November 21,

2018, and is a continuation of U.S. Application No. 13/930,808, filed on June 28, 2013, which is

a continuation of U.S. Application No. 10/997,062, filed on November 24, 2004. The '073 Patent

also claims the benefit of Provisional Application No. 60/525,208, filed on November 26, 2003.

The '073 Patent issued with 55 claims, including independent claims 1, 26, and 41, claims 2–25,

which depend from claim 1, claims 27–40, which depend from claim 26, and claims 42–55, which

depend from claim 41.

22.    Representative independent Claim 41 of the '073 Patent provides:

*A handheld medical ultrasound imaging device comprising:*
*at least one handheld transducer assembly to perform an imaging operation*
*wherein the at least one transducer assembly includes a probe housing, a*
*transducer array, and a cable with a first transducer connector; and a*
*handheld portable processing unit connectable to the at least one handheld*
*transducer assembly with the cable and the first transducer connector at a*
*processing unit connector, the processing unit having an integrated touch*
*screen display that displays an ultrasound image wherein the integrated*
*touch screen display is mounted integral with a processor operative in*
*response to the integrated touch screen display, a memory system, a battery,*
*the processor configured to communicate with an ultrasound beamformer*
*processing circuit, the processor being operative in response to finger*
*operation of the integrated touch screen display to operate a graphical user*
*interface that displays one or more automatically set imaging parameters*
*of the at least one transducer assembly upon connection of the first*
*transducer connector to the processing unit connector and selection of an*
*anatomical structure to be imaged, wherein the processor is configured to*
*operate a plurality of computer programs including a scan conversion*
*program, a Doppler processing program, an automatically set image*
*parameter module and a transducer identification program segment that*
*detects an attached transducer assembly.*

23.    Asserted U.S. Patent No. 12,115,023, attached hereto at Ex. B, is generally directed

to systems and methods of medical ultrasound imaging, employing medical ultrasound imaging

equipment that includes a handheld housing in a tablet form factor, and a touch screen display

disposed on a front panel of the housing. The touch screen display includes a multitouch touch

screen that can recognize and distinguish one or more single, multiple, and/or simultaneous touches on a surface of the touch screen display, thereby allowing the use of gestures, ranging from simple single point gestures to complex multipoint gestures, as user inputs to the medical ultrasound imaging equipment.  The '023 Patent issued from U.S. Application No. 16/806,118, filed on March 2, 2020, and is a continuation of U.S. Application  No. 13/838,694, filed Mar. 15, 2013, which claims priority to U.S. Provisional Application No. 61/615,627 filed Mar. 26, 2012 and also claims priority to U.S. Provisional Application No. 61/704,254 filed Sep. 21, 2012.  The '023 Patent issued with 27 claims, including independent claims 1, 12, and 17, claims 2-11 which depend from claim 1, claims 13-16, which depend from claim 12, and claims 18-27 which depend from claim 17.

    24.     Representative independent claim 1 of the '023 Patent provides:

> *A method of operating a cart mounted medical ultrasound imaging device, the cart-mounted medical ultrasound imaging device being mounted on a cart and including a multiport transducer connector that is connectable to one or more transducer probes wherein each transducer probe includes a transducer in a handheld transducer housing, a tablet housing having a front panel, a computer in the tablet housing, the computer including at least one processor that controls an ultrasound imaging operation and at least one memory, a touch screen display for displaying an ultrasound image and for selectively performing a measurement of a displayed feature within the ultrasound image, the touch screen display positioned on the front panel, and wherein the computer communicates with a controller connected to an ultrasound beamformer processing circuit, the computer further communicating with a display controller connected to the touch screen display, the method comprising the steps of:*
> *selecting a transducer of at least one transducer probe that is connected to the multiport transducer connector with a touch actuated input on the touch screen display to perform an ultrasound imaging procedure; operating the selected transducer that communicates with the ultrasound beamformer processing circuit such that beamformed image data is processed and displayed on an ultrasound image display window area of the touch screen display that is powered by a battery carried on the cart, the touch screen display having a plurality of touch actuated icons outside the image display window area that operate imaging parameters wherein at least one of the touch actuated icons operates access to a patient data display window and*

> *at least one of the touch actuated icons can actuate a plurality of imaging parameter presets wherein each of the plurality of imaging parameter presets automatically sets imaging parameters for imaging of a touch selectable anatomic structure, the imaging parameter presets being selected from a touch actuated preset selection window that lists a plurality of anatomic structures; receiving, at the computer, a first touch gesture input from the touch screen display that selects at least one of the imaging parameter presets corresponding to a selected anatomic structure; and in response to a further touch gesture input from the touch screen display, altering at least one of the automatically set imaging parameters to adjust an imaging operation of the selected anatomic structure.*

25.    Asserted U.S. Patent No. 12,102,480, attached hereto at Ex. C, is generally directed to systems and methods of medical ultrasound imaging, which employ medical ultrasound imaging equipment that includes a handheld housing in a tablet form factor, and a touch screen display disposed on a front panel of the housing. The touch screen display includes a multitouch touchscreen that can recognize and distinguish one or more single, multiple, and/or simultaneous touches on a surface of the touch screen display, thereby allowing the use of gestures, ranging from simple single point gestures to complex multipoint moving gestures, as user inputs to the medical ultrasound imaging equipment. The '480 Patent issued from Application No. 18/397,557, filed Dec. 27, 2023, and is a continuation of U.S. Application No. 17/520,150, filed Nov. 5, 2021, which is a continuation of U.S. Application No. 15/833,547, filed Dec. 6, 2017, which is a continuation of U.S. application Ser. No. 14/037,106, filed Sep. 25, 2013, which is a continuation-in-part of PCT Application PCT/US2013/033941 filed Mar. 26, 2013, and is a continuation of U.S. Application No. 13/838,694 filed Mar. 15, 2013, which claims priority to U.S. Provisional Application No. 61/615,627, filed Mar. 26, 2012 and to U.S. Provisional Application No. 61/704,254, filed Sep. 21, 2012. The '480 Patent issued with 20 claims, including independent claim 1, and claims 2-20 which depend from claim 1.

26.    Representative independent claim 1 of the '480 Patent provides:

*A portable touchscreen actuated cart mounted ultrasound imaging system, comprising:*

*a touch screen tablet display device mounted on a cart having a touch screen display with a graphical user interface for selecting an ultrasound imaging procedure to be performed with the cart mounted ultrasound imaging system wherein at least one processor in the tablet display device is responsive to touch actuating gestures to perform an ultrasound imaging procedure selected from a plurality of selectable ultrasound imaging procedures including at least one of a cardiac imaging procedure, a vascular imaging procedure and a lesion imaging procedure; a chargeable battery module mounted to the cart that provides power to the touch screen display tablet device; a field programmable gate array (FPGA) configured to manage an ultrasound scan sequence of the selected ultrasound imaging procedure; a multiport transducer connector mounted on the cart to connect one or more transducer probes to the tablet display device, each transducer probe having at least one transducer array that performs at least one imaging operation using an ultrasound beamformer processing integrated circuit that communicates with the at least one transducer array, the at least one imaging operation conducted using instructions received from the FPGA, wherein the graphical user interface is touch actuated to include the image display area that displays at least one ultrasound image using one or more touch selected transducer probes; a complex programmable logic device (CPLD) that clocks an ultrasound scan by at least one of one or more transducer probes; and wherein one or more imaging operations include selecting an imaging depth in response to a further gesture input detected on the touch screen display and generating at least one image of a region of interest at the selected depth based on a result of the one or more imaging operations, the at least one generated image displayable on the image display area of the touch screen display.*

27.    Asserted U.S. Patent No. 11,857,363, attached hereto at Ex. D, is generally directed to compact portable or tablet-based ultrasound systems that include beamforming circuitry, and more specifically to systems and methods for portable medical ultrasound imaging that dispense with the need for traditional keyboards and controls.  The '363 Patent issued from U.S. Application No. 17/520,150, which was filed on November 5, 2021 and is a continuation of U.S. Application No. 15/833,547, filed on December 6, 2017, which is continuation of U.S. Application No. 14/037,106, filed on September 25, 2013, which issued as the '699 Patent.  The '363 Patent issued

with 27 claims, including independent claims 1, 7, and 18, claims 2-6, which depend from claim

1, claims 8-17, which depend from claim 7, and claims 19-27, which depend from claim 18.

28.    Representative independent Claim 7 of the '363 Patent provides:

> *A portable touchscreen actuated ultrasound imaging system, comprising:*
> *a touch screen display tablet device mounted on a cart having a touch*
> *screen display with a graphical user interface for selecting an ultrasound*
> *imaging procedure to be performed with the ultrasound imaging system*
> *wherein at least one processor in the tablet display device is responsive to*
> *touch actuating gestures to perform at least one of a cardiac imaging*
> *procedure, a split screen imaging procedure, and a needle visualization*
> *procedure, wherein the cardiac imaging procedure measures an ejection*
> *fraction value in response to a first gesture input detected on a touch screen*
> *display within the tablet display housing, and wherein the needle*
> *visualization procedure images a needle in response to a second gesture*
> *input detected on the touch screen display; and a transducer array in a*
> *transducer probe housing that performs a plurality of imaging operations*
> *using an ultrasound beamformer processing circuit that communicates with*
> *the transducer array, the imaging operations conducted using instructions*
> *received from an ultrasound imaging system controller, wherein the*
> *graphical user interface is actuated to include an image display area that*
> *displays at least one ultrasound image, wherein one or more imaging*
> *operations include selecting an imaging depth in response to a further*
> *gesture input detected on the touch screen display and generating at least*
> *one image of a region of interest at the selected depth based on a result of*
> *the one or more imaging operations, the at least one generated image*
> *displayable on the image display area of the touch screen display.*

29.    Asserted U.S. Patent No. 9,877,699, attached hereto at Ex. E, is generally directed

to compact portable or tablet-based ultrasound systems that include beamforming circuitry.  The

'699 Patent issued from U.S. Application No. 14/037,106, filed on September 25, 2013, which is

a continuation-in-part of International Application No. PCT/US2013/033941, filed on March 26,

2013, which is a continuation-in-part of U.S. Application No. 13/838,694, filed on March 15, 2013.

The '699 Patent also claims the benefit of Provisional Application No. 61/615,627, filed on March

26, 2012 and Provisional Application No. 61/704,254, filed on September 21, 2012.  The '699

Patent issued with 59 claims, including independent claims 1 and 45, claims 2–44, which depend

from claim 1, and claims 46–59, which depend from claim 45.

30.     Representative independent claim 45 of the '699 Patent provides:

*A method of operating a handheld medical ultrasound imaging device, the medical ultrasound imaging device comprising a transducer probe, a tablet housing, the tablet housing having a front panel, a computer in the housing, the computer including at least one processor and at least one memory, a touch screen display that displays an ultrasound image, the image being adjustable in response to an imaging depth control touch gesture and that displays a split screen icon such that the touch screen can operate in a split screen format to display the ultrasound image and a second diagnostic image, the touch screen display positioned on the front panel, and an ultrasound beamformer processing circuit disposed in the tablet housing that is powered by a battery, the touch screen display and the ultrasound beamformer processing circuit being communicably coupled to the computer, the method comprising the steps of: receiving, at the computer, a first input from the touch screen display to actuate a needle guide operation; and in response to a second input from the touch screen display, operating the ultrasound beamformer processing circuit to image a needle inserted into a patient.*

## HISTORY BETWEEN TERATECH AND MINDRAY

### Mindray Has Actual Knowledge of the Asserted Patents

31.     Upon information and belief, in or around 2004 Mindray decided to develop a portable ultrasound product.

32.     In the 2004-2005 time period, Teratech and Mindray entered into an Original Equipment Manufacturer ("OEM") relationship and a number of the Teratech early ultrasound beamforming "engines" were sold and shipped directly to Mindray. These products included the required electronics and software needed for Mindray to construct and sell an ultrasound product. Thus, Mindray had early access to Teratech's portable ultrasound technology that they could not obtain and did not otherwise independently possess at the time. Upon information and belief, before this relationship with Teratech, Mindray had no pathway to a portable ultrasound system.

33.     By virtue of this OEM relationship, Teratech provided Mindray with beamformer units and transducers, as well as Teratech manuals, engineers, and know-how, with access to all

of Teratech's supported features through a software API.  Thus, in 2004-2005, Mindray had access to the features of the Teratech commercial product available at that time.

34.    This OEM relationship integrated Teratech's products into an ultrasound solution using Mindray's branding.  The OEM Agreement specifically stated that "[t]he combined product cannot be marketed as a PC based or laptop based solution similar to the TERASON Products." *See* Ex. F at 2 (OEM Agreement).

35.    The OEM Agreement is further specifically subject to the "valid patent rights" of the Parties.  *Id.* at 12.

36.    Therefore, and upon information and belief, at the time of the OEM Agreement, Mindray was aware of Teratech's patent portfolio, including patents specifically directed to portable ultrasound technology.

37.    Following the completion of the OEM relationship in around 2005-2006, Mindray did not do further business with Teratech and had no ongoing license or other authority to use Teratech's technology.

38.    Since at least 2013, and at all times during the pendency of the Asserted Patents, Mindray and Teratech have been direct competitors.  Upon information and belief, on certain occasions, Teratech has lost business to Mindray where existing Teratech customers have elected to purchase ultrasound products from Mindray.

39.    Additionally, Mindray is the owner and/or assignee of several patents and patent applications that cite Teratech patents directed to the portable ultrasound technology claimed in the Asserted Patents.

40.    For example, in 2013, Mindray acquired Zonare Medical Systems, Inc. ("Zonare"). At the time of this acquisition, Zonare was the assignee of U.S. Patent No. 7,352,570 (the "'570

Patent"), titled "Portable Ultrasound Unit and Docking Station." The '570 Patent cited U.S. Patent No. 5,690,114 (the "'114 Patent"), titled "Portable Ultrasound Imaging System." The '114 Patent issued to inventor Alice Chiang in 1997, and was then assigned to TeraTech Corp. Therefore, at the time of the acquisition of Zonare and as part of the diligence done prior to that purchase, upon information and belief, Mindray had actual knowledge of the Teratech ultrasound patent portfolio, which included technology that would evolve into the Asserted Patents.

41.    Additionally, in 2019, Mindray filed U.S. Patent Application No. 16/367,514 ("'514 Application"), which issued in 2022 as U.S. Patent No. 11,304,677 (the "'677 Patent"). On the face of the '677 Patent, Mindray cited U.S. Patent No. 10,667,790 (the "'790 Patent") to Chiang. The '790 Patent was assigned to TeraTech Corp. In addition to being cited on the face of the '677 Patent, the '790 Patent was specifically called out by the examiner during prosecution of the '677 Patent. During that examination, the examiner specifically noted that the '790 Patent to Chiang et al. "discloses performing a size measurement of a lesion within a virtual window of an ultrasound image by using one or more multi-finger gestures on the surface of a touch screen." ('514 Application, September 2, 2021 Office Action).

42.    The '790 Patent claims priority to U.S. Provisional Application Nos. 61/615,627 and 61/704,254, as do the asserted '480, '363, '023, and '699 Patents. Therefore, by at least 2021, Mindray had specific knowledge of the Teratech portable ultrasound patent portfolio that includes four out of five of the Asserted Patents. Indeed, the '699 Patent issued in 2018, and therefore, upon information and belief, by at least the time the '790 Patent was cited during prosecution of the '677 Patent, Mindray had actual knowledge of the issued '699 Patent.

43.    The '790 Patent was further cited during the prosecution of Mindray U.S. Patent No. 11,890,141, which issued on February 6, 2024. Therefore, and upon information and belief,

13

Mindray had further, ongoing, actual knowledge of the Asserted Patents that issued from the '627 and '254 Provisional Applications, including the Asserted Patents.

44.    Indeed, the application that issued as the asserted '699 Patent has been cited during prosecution of Mindray patents.  For example, during prosecution of Mindray U.S. Patent No. 10,716,538, which issued in 2020 (the "'528 Patent") the Examiner cited the Teratech Patent Application Publication No. 20140121524 (the "'524 Publication")—this is the application that issued as the '699 Patent in 2018, two years before the '528 Patent actually issued.

45.    Similarly, Mindray U.S. Patent No. 10,610,202, which issued on April 7, 2020 (the "'202 Patent"), cites the '524 Publication among the "References Cited" by the Examiner during examination of the Mindray application that issued as the '202 Patent.  As noted above, this published application issued as the asserted '699 Patent in 2018; again this is two years before the '202 Patent issued.

46.    As a final non-limiting example, Mindray U.S. Patent No. 12,290,397, which issued in May 2025 (the "'397 Patent"), also cited the '524 Publication (not the issued '699 Patent), even though the application that issued as the '397 Patent was filed five years after the '699 Patent issued.

47.    Furthermore, Mindray Global was traded on the NYSE between 2006 and 2016 under the name Mindray Medical International Limited.  Throughout this timeframe, Mindray submitted regular filings with U.S. SEC, including 20-F Statements.

48.    Mindray's 20-F statements specifically acknowledge their competitors' patent portfolios.  "We face competition from companies that have . . . patent portfolios that may present an obstacle to our conduct of business."  *See* Mindray Medical International Limited,  Form 20-F

(2014) at 10.[1]  Upon information and belief, such competitors include Teratech, and the patents referenced include the patent families that would ultimately include the Asserted Patents.  Upon further information and belief, Mindray has continued to be aware of "patent portfolios that may present an obstacle" to their business up to and including through the filing of this Complaint.

49.    Further, other Mindray 20-F Statements specifically reference Mindray's corporate policy of affirmatively performing freedom-to-operate searches for each of their products.

> *In 2000, we implemented and continue to follow a procedure under which product development teams are required to conduct a patent clearance search (i.e. freedom-to-operate search) for each product at the beginning of the product development process.  The scope of the search includes patents in China, the United States and Europe.*

Mindray Medical International Limited, Form 20-F (2007) at 35.[2]

50.    Upon information and belief, these freedom to operate searches included comparing Mindray's products to patent claims and evaluating the infringement of those patents. Upon further information and belief, this included an analysis of the Asserted Patents against the Accused Products, and therefore resulted in actual knowledge that Mindray's sale and use, and its customers' and end users' use, of the Accused Products constitutes infringement of the Asserted Patents.

51.    Therefore, and upon information and belief, based on the OEM relationship formed between Mindray and Teratech in 2004, the ongoing competitive relationship between Teratech and Mindray in the years between 2013 and the present, Mindray's actual knowledge of Teratech patents, including the Asserted Patents, by virtue of its patent prosecution activities, and Mindray's corporate policy of affirmatively searching for competitors' patents and conducting freedom-to-

---

[1] https://www.sec.gov/Archives/edgar/data/1373060/000114420415023316/v404082_20f.htm
[2] https://www.sec.gov/Archives/edgar/data/1373060/000114554908001185/h02233e20vf.htm

ME1\57842116.v1

operate analyses, Mindray has had, and continues to have, actual knowledge of Teratech's patent portfolio, including at least the Asserted Patents.

### Mindray Was Willfully Blind to the Existence of the Asserted Patents

52. To the extent that Mindray contends that it did not have actual knowledge of the Asserted Patents, Mindray was willfully blind to their existence and took active measures to avoid learning of Teratech's patents.

53. For example, Mindray had actual and intimate technical knowledge of the Teratech products by virtue of the OEM relationship, including access to the products and the Teratech engineers and know-how. Upon information and belief, Mindray used its intimate access to the Teratech products and know-how to develop its own, infringing, product line, which ultimately included the Accused Products.

54. In addition to this actual knowledge of the Teratech products and capabilities, Mindray had actual knowledge of Teratech's patent portfolio, including at least the '114 and '790 Patents, as well as the asserted '699 Patent, which were specifically cited on the face of patents owned or assigned to Mindray, and are directed generally to the technology in the Teratech products that Mindray had access to.

55. Further, and as discussed above, Mindray had a corporate policy, as of at least the year 2000, of affirmatively evaluating competitors' patent portfolios and performing freedom to operate searches. Upon information and belief, these freedom to operate searches included evaluating competitors' patent portfolios, including Teratech's, and comparing Mindray's products to patent claims in order to evaluate infringement of those patents. Upon further information and belief, this included comparison of the Asserted Patents against the Accused

Products, and therefore actual knowledge that Mindray's and its customers' and end users' use of the Accused Products constitutes infringement of the Asserted Patents.

56.    Therefore, to the extent that Mindray somehow avoided actual knowledge of the Asserted Patents, it was through active avoidance and willful blindness, while at the same time copying Teratech's products, citing Teratech's patents in certain, but not all, of Mindray's patent applications directed to portable ultrasound technology, and conducting freedom-to-operate searches involving competitors' patent portfolios.

## Mindray Has Actual Knowledge That Use of the Accused Products Infringes the Asserted Patents and Actively Induces Such Use

57.    As described above, Mindray had, and continues to have, knowledge of the operations of the Accused Products as well as their customers' and end-users' use of these products. Upon information and belief, Mindray actively induces their customers and end-users to use the Accused Products in an infringing manner.

58.    For example, upon information and belief, Mindray provides customers with extensive product brochures detailing how to use the Accused Products and therefore perform the methods of the Asserted Patents; Mindray provides onsite product training and in-service for the end-users; Mindray provides demonstrations of the Accused Products performing the methods of the Asserted Patents; and Mindray provides instructional seminars that include, upon information and belief, use of the Accused Products in an infringing manner.

59.    Therefore, upon information and belief, Mindray has at all times during the pendency of the Asserted Patents had both actual knowledge of the patents and actual knowledge that Mindray's and their customers' and end-users' use of the Accused Products constitutes infringement of the Asserted Patents. Through and in conjunction with their product brochures,

instructional materials, demonstrations, and seminars, Mindray has, therefore, actively induced their customers and end-users to use the Accused Products in an infringing manner.

60.    Finally, Mindray has had actual knowledge of both the Asserted Patents and that the use of its products by both Mindray and its customers and end users constitutes infringement of the Asserted Patents since at least the filing and service of this Complaint.  Upon information and belief, Mindray continues to infringe, and to actively induce infringement, even following receipt of this Complaint.

## THE ACCUSED PRODUCTS

61.    Mindray's "TE" family of ultrasound products are named individually as at least the TE5, TE7, TE7 (Crystal), TE7 Max, TE X and TEX 20 models. The TE5, TE7 and TE Max have been  marketed as being mountable on a cart or separately operated on a table or mounted on a wall bracket and therefore the display tablet display housing can literally be carried in the hand of a user between locations for use.

62.    In 2015, the first TE7 product was introduced and received FDA approval for sale in the United States.  This design implemented a touchscreen controlled tablet design that was mounted on a cart, and was detachable from the cart for placement on a stand on a table surface, or could be wall mounted.

63.     The TE7 is a tablet-based portable ultrasound system, shown as follows:



64.     The TE7 product brochure advertises the system's incorporation of "Second generation iNeedle+ technology" for "automatically detect[ing] needle angle and improv[ing] visibility on both linear and convex transducers during interventional procedures."[3]

65.     In the TE7 device, as well as each of the similar Accused Products, according to the Mindray user manuals, the tablets are battery-powered and utilize touchscreen interfaces to operate the many ultrasound operations and also display and manipulate the ultrasound images and quantitative measurements on the touchscreen display.

66.     Based on the available product manuals published by Mindray concerning the "TE" product family of ultrasound products currently being sold in the United States, the beamformer used in these products is located in the tablet display housing with an integrated transducer multiport connector assembly.

67.     Given the hand portable nature of this design and the use of numerous transducers connectable to multiple ports, this design includes all the image acquisition and processing for

---

[3] https://www.mindraynorthamerica.com/wp-content/uploads/2020/08/Mindray_TE7_crystal-brochure_40376D.pdf.

components in a battery operated display and processor housing having a tablet form factor as described in the Asserted Teratech Patents.

68.    As another example, the Mindray TEX device is a tablet-based portable ultrasound system, shown as follows:



69.    This system uses a larger touchscreen tablet having a multiport connector located on the tablet housing that provides the option of connecting a single transducer or simultaneously attaching two or more transducers with touch selectable operation of the attached transducers.

## COMPLIANCE WITH 35 U.S.C. § 287

70.    Upon information and belief, at all times Plaintiff Teratech has been in compliance with 35 U.S.C. § 287.

## COUNT I

## Direct Infringement of the '073 Patent

71.    Teratech realleges and incorporates by reference each of the foregoing paragraphs.

72.    On information and belief, Mindray directly infringes at least representative claim

41 of U.S. Patent No. 11,675,073 through the use, sale, and offer for sale of systems and devices including at least the TE7 and TEX Accused Products.  A chart detailing infringement of representative claim 41 the '073 Patent by the Mindray TE7 Product is attached hereto at Ex. G. A chart detailing infringement of representative claim 41 of the '073 Patent by the Mindray TEX Product is attached hereto at Ex. H.

73.    Mindray's infringement has been and continues to be willful and deliberate because Minday has, on information and belief, been aware of its infringement and continued to infringe the '073 Patent since at least its issuance in 2023.

74.    Mindray's infringement of the '073 Patent will continue unless enjoined by this Court.

75.    Mindray's infringement of the '073 Patent has caused and will continue to cause damages to Teratech in an amount not yet determined for which Teratech is entitled to relief.

76.    Further, Mindray's infringement of the '073 Patent has caused and will continue to cause irreparable harm to Teratech incapable of being fully remedied by damages alone.  Mindray should be enjoined from further infringement of the '073 Patent.

77.    No amount of damages can fully compensate Teratech.

78.    The public interest favors an injunction to protect Teratech's investment-based risk resulting in the commercialization of the technology claimed in the '073 Patent and to enforce the Patent Act's statutory rights to exclude others from practicing Teratech's patented inventions. Accordingly, the circumstances of Mindray's infringement warrant injunctive relief.

79.    Mindray's infringement of the '073 Patent is willful and deliberate, entitling Teratech to enhanced damages under 35 U.S.C. § 284 and to attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT II

### Indirect Infringement of the '073 Patent

80.     Teratech realleges and incorporates by reference each of the foregoing paragraphs.

81.     Upon information and belief, Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '073 Patent under 35 U.S.C. §§ 271(b) and (c) by actively inducing others, including its customers, distributors, and end-users to directly infringe the '073 Patent, and/or by contributing to the infringement thereof.

82.     Defendants have had actual knowledge of the '073 Patent since at least its issuance in 2023. Despite this knowledge, Defendants are proceeding with their infringing activity, and with the specific intent to cause (or willful blindness of) infringement of the '073 Patent by others as set forth herein.

83.     By way of example, Defendants' indirect infringement includes actively inducing its customers and end-users to use the infringing systems and devices as set forth herein.

84.     As a direct result of Defendants' conduct, customers and end-users have committed acts of direct infringement of the '073 Patent and Defendants are therefore liable for induced and/or contributory infringement.

85.     Defendants' indirect infringement of the '073 Patent will continue to damage Teratech's business, causing irreparable harm, for which there is no adequate remedy at law, unless it is enjoined by this Court.

86.     In addition, Defendants have infringed the '073 Patent—directly, contributorily, and by inducement—with full knowledge of the '073 Patent and despite having full knowledge that their actions constituted infringement of that patent. For at least this reason, Defendants have willfully infringed the '073 Patent, entitling Teratech to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

ME1\57842116.v1

## COUNT III

### Direct Infringement of the '480 Patent

87.    Teratech realleges and incorporates by reference each of the foregoing paragraphs.

88.    On information and belief, Mindray directly infringes at least representative claim 1 of U.S. Patent No. 12,102,480 through the use, sale, and offer for sale of systems and devices including at least the TEX Accused Product.  A chart detailing infringement of representative claim 1 the '480 Patent by the Mindray TEX Product is attached hereto at Ex. I.

89.    Mindray's infringement has been and continues to be willful and deliberate because Minday has, on information and belief, been aware of its infringement and continued to infringe the '480 Patent since at least its issuance in 2024.

90.    Mindray's infringement of the '480 Patent will continue unless enjoined by this Court.

91.    Mindray's infringement of the '480 Patent has caused and will continue to cause damages to Teratech in an amount not yet determined for which Teratech is entitled to relief.

92.    Further, Mindray's infringement of the '480 Patent has caused and will continue to cause irreparable harm to Teratech incapable of being fully remedied by damages alone. Mindray should be enjoined from further infringement of the '480 Patent.

93.    No amount of damages can fully compensate Teratech.

94.    The public interest favors an injunction to protect Teratech's investment-based risk resulting in the commercialization of the technology claimed in the '480 Patent and to enforce the Patent Act's statutory rights to exclude others from practicing Teratech's patented inventions. Accordingly, the circumstances of Mindray's infringement warrant injunctive relief.

95.    Mindray's infringement of the '480 Patent is willful and deliberate, entitling Teratech to enhanced damages under 35 U.S.C. § 284 and to attorneys' fees and costs

ME1\57842116.v1

under 35 U.S.C. § 285.

## COUNT IV

### Indirect Infringement of the '480 Patent

96.     Teratech realleges and incorporates by reference each of the foregoing paragraphs.

97.     Upon information and belief, Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '480 Patent under 35 U.S.C. §§ 271(b) and (c) by actively inducing others, including its customers, distributors, and end-users to directly infringe the '073 Patent, and/or by contributing to the infringement thereof.

98.     Defendants have had actual knowledge of the '480 Patent since at least its issuance in 2024. Despite this knowledge, Defendants are proceeding with their infringing activity, and with the specific intent to cause (or willful blindness of) infringement of the '480 Patent by others as set forth herein.

99.     By way of example, Defendants' indirect infringement includes actively inducing its customers and end-users to use the infringing systems and devices as set forth herein.

100.    As a direct result of Defendants' conduct, customers and end-users have committed acts of direct infringement of the '480 Patent and Defendants are therefore liable for induced and/or contributory infringement.

101.    Defendants' indirect infringement of the '480 Patent will continue to damage Teratech's business, causing irreparable harm, for which there is no adequate remedy at law, unless it is enjoined by this Court.

102.    In addition, Defendants have infringed the '480 Patent—directly, contributorily, and by inducement—with full knowledge of the '480 Patent and despite having full knowledge that their actions constituted infringement of that patent. For at least this reason, Defendants have

willfully infringed the '480 Patent, entitling Teratech to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT V

### Direct Infringement of the '363 Patent

103.    Teratech realleges and incorporates by reference each of the foregoing paragraphs.

104.    On information and belief, Mindray directly infringes at least representative claim 7 of U.S. Patent No. 11,857,363 through the use, sale, and offer for sale of systems and devices, including at least the TE7 Accused Product.  A chart detailing infringement of representative claim 7 of the '363 Patent by the Mindray TE7 Product is attached hereto at Ex. J.  A chart detailing infringement of representative claim 7 of the '363 Patent by the Mindray TEX Product is attached hereto at Ex. K.

105.    Mindray's infringement has been and continues to be willful and deliberate because Minday has, on information and belief, been aware of its infringement and continued to infringe the '363 Patent since at least its issuance in 2024.

106.    Mindray's infringement of the '363 Patent will continue unless enjoined by this Court.

107.    Mindray's infringement of the '363 Patent has caused and will continue to cause damages to Teratech in an amount not yet determined for which Teratech is entitled to relief.

108.    Further, Mindray's infringement of the '363 Patent has caused and will continue to cause irreparable harm to Teratech incapable of being fully remedied by damages alone. Mindray should be enjoined from further infringement of the '363 Patent.

109.    No amount of damages can fully compensate Teratech.

110.    The public interest favors an injunction to protect Teratech's investment-based risk

resulting in the commercialization of the technology claimed in the '363 Patent and to enforce the Patent Act's statutory rights to exclude others from practicing Teratech's patented inventions. Accordingly, the circumstances of Mindray's infringement warrant injunctive relief.

111.    Mindray's infringement of the '363 Patent is willful and deliberate, entitling Teratech to enhanced damages under 35 U.S.C. § 284 and to attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT VI

## Indirect Infringement of the '363 Patent

112.    Teratech realleges and incorporates by reference each of the foregoing paragraphs.

113.    Upon information and belief, Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '363 Patent under 35 U.S.C. §§ 271(b) and (c) by actively inducing others, including its customers, distributors, and end-users to directly infringe the '073 Patent, and/or by contributing to the infringement thereof.

114.    Defendants have had actual knowledge of the '363 Patent since at least its issuance in 2023. Despite this knowledge, Defendants are proceeding with their infringing activity, and with the specific intent to cause (or willful blindness of) infringement of the '363 Patent by others as set forth herein.

115.    By way of example, Defendants' indirect infringement includes actively inducing its customers and end-users to use the infringing systems and devices as set forth herein.

116.    As a direct result of Defendants' conduct, customers and end-users have committed acts of direct infringement of the '363 Patent and Defendants are therefore liable for induced and/or contributory infringement.

117.    Defendants' indirect infringement of the '363 Patent will continue to damage

Teratech's business, causing irreparable harm, for which there is no adequate remedy at law, unless it is enjoined by this Court.

118.    In addition, Defendants have infringed the '363 Patent—directly, contributorily, and by inducement—with full knowledge of the '363 Patent and despite having full knowledge that their actions constituted infringement of that patent. For at least this reason, Defendants have willfully infringed the '363 Patent, entitling Teratech to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT VII

### Direct Infringement of the '023 Patent

119.    Teratech realleges and incorporates by reference each of the foregoing paragraphs.

120.    On information and belief, Mindray directly infringes at least representative claim 1 of U.S. Patent No. 12,115,023 through the use, sale, and offer for sale of systems and devices including at least the TE7 Accused Product.  A chart detailing infringement of representative claim 1 the '023 Patent by the Mindray TE7 Product is attached hereto at Ex. L.

121.    Mindray's infringement has been and continues to be willful and deliberate because Minday has, on information and belief, been aware of its infringement and continued to infringe the '023 Patent since at least its issuance in 2024.

122.    Mindray's infringement of the '023 Patent will continue unless enjoined by this Court.

123.    Mindray's infringement of the '023 Patent has caused and will continue to cause damages to Teratech in an amount not yet determined for which Teratech is entitled to relief.

124.    Further, Mindray's infringement of the '023 Patent has caused and will continue to cause irreparable harm to Teratech incapable of being fully remedied by damages alone. Mindray

should be enjoined from further infringement of the '023 Patent.

125.    No amount of damages can fully compensate Teratech.

126.    The public interest favors an injunction to protect Teratech's investment-based risk resulting in the commercialization of the technology claimed in the '023 Patent and to enforce the Patent Act's statutory rights to exclude others from practicing Teratech's patented inventions. Accordingly, the circumstances of Mindray's infringement warrant injunctive relief.

127.    Mindray's infringement of the '023 Patent is willful and deliberate, entitling Teratech to enhanced damages under 35 U.S.C. § 284 and to attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT VIII

### Indirect Infringement of the '023 Patent

128.    Teratech realleges and incorporates by reference each of the foregoing paragraphs.

129.    Upon information and belief, Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '023 Patent under 35 U.S.C. §§ 271(b) and (c) by actively inducing others, including its customers, distributors, and end-users to directly infringe the '073 Patent, and/or by contributing to the infringement thereof.

130.    Defendants have had actual knowledge of the '023 Patent since at least its issuance in 2023. Despite this knowledge, Defendants are proceeding with their infringing activity, and with the specific intent to cause (or willful blindness of) infringement of the '023 Patent by others as set forth herein.

131.    By way of example, Defendants' indirect infringement includes actively inducing its customers and end-users to use the infringing systems and devices as set forth herein.

132.    As a direct result of Defendants' conduct, customers and end-users have committed

acts of direct infringement of the '023 Patent and Defendants are therefore liable for induced and/or contributory infringement.

133.    Defendants' indirect infringement of the '023 Patent will continue to damage Teratech's business, causing irreparable harm, for which there is no adequate remedy at law, unless it is enjoined by this Court.

134.    In addition, Defendants have infringed the '023 Patent—directly, contributorily, and by inducement—with full knowledge of the '023 Patent and despite having full knowledge that their actions constituted infringement of that patent. For at least this reason, Defendants have willfully infringed the '023 Patent, entitling Teratech to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT IX

### Direct Infringement of the '699 Patent

135.    Teratech realleges and incorporates by reference each of the foregoing paragraphs.

136.    On information and belief, Mindray directly infringes at least representative claim 45 of U.S. Patent No. 9,877,699 through the use, sale, and offer for sale of systems and devices including at least the TE7 Accused Product.  A chart detailing infringement of representative claim 45 the '699 Patent by the Mindray TE7 Product is attached hereto at Ex. M.

137.    Mindray's infringement has been and continues to be willful and deliberate because Minday has, on information and belief, been aware of its infringement and continued to infringe the '699 Patent since at least its issuance in 2018.

138.    Mindray's infringement of the '699 Patent will continue unless enjoined by this Court.

139.    Mindray's infringement of the '699 Patent has caused and will continue to cause

damages to Teratech in an amount not yet determined for which Teratech is entitled to relief.

140.    Further, Mindray's infringement of the '699 Patent has caused and will continue to cause irreparable harm to Teratech incapable of being fully remedied by damages alone. Mindray should be enjoined from further infringement of the '699 Patent.

141.    No amount of damages can fully compensate Teratech.

142.    The public interest favors an injunction to protect Teratech's investment-based risk resulting in the commercialization of the technology claimed in the '699 Patent and to enforce the Patent Act's statutory rights to exclude others from practicing Teratech's patented inventions. Accordingly, the circumstances of Mindray's infringement warrant injunctive relief.

143.    Mindray's infringement of the '699 Patent is willful and deliberate, entitling Teratech to enhanced damages under 35 U.S.C. § 284 and to attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT X

### Indirect Infringement of the '699 Patent

144.    Teratech realleges and incorporates by reference each of the foregoing paragraphs.

145.    Upon information and belief, Defendants have indirectly infringed and continue to indirectly infringe one or more claims of the '699 Patent under 35 U.S.C. §§ 271(b) and (c) by actively inducing others, including its customers, distributors, and end-users to directly infringe the '699 Patent, and/or by contributing to the infringement thereof.

146.    Defendants have had actual knowledge of the '699 Patent since at least its issuance in 2018. Despite this knowledge, Defendants are proceeding with their infringing activity, and with the specific intent to cause (or willful blindness of) infringement of the '699 Patent by others as

set forth herein.

147.    By way of example, Defendants' indirect infringement includes actively inducing its customers and end-users to use the infringing systems and devices as set forth herein.

148.    As a direct result of Defendants' conduct, customers and end-users have committed acts of direct infringement of the '699 Patent and Defendants are therefore liable for induced and/or contributory infringement.

149.    Defendants' indirect infringement of the '699 Patent will continue to damage Teratech's business, causing irreparable harm, for which there is no adequate remedy at law, unless it is enjoined by this Court.

150.    In addition, Defendants have infringed the '699 Patent—directly, contributorily, and by inducement—with full knowledge of the '699 Patent and despite having full knowledge that their actions constituted infringement of that patent. For at least this reason, Defendants have willfully infringed the '699 Patent, entitling Teratech to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Teratech respectfully prays for the following relief:

(a)    A judgment that Mindray has infringed, directly and indirectly the '073, '480, '363, '023, and '699 Patents;

(b)    An order enjoining Mindray, together with its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and those persons in active concert or participation with them, from infringing the '073, '480, '363, '023, and '699 Patents;

(c)    An award of damages adequate to compensate Teratech for Mindray's infringement of the '073, '480, '363, '023, and '699 Patents pursuant to 35 U.S.C. § 284;

31

(d)    An award of pre-judgment and post-judgment interest;

(e)    An award of attorneys' fees pursuant to 35 U.S.C. § 285;

(f)    Such other relief as the Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a

trial by jury as to all issues so triable.


Dated:  September 15, 2025                           MCCARTER & ENGLISH, LLP

OF COUNSEL:                                          /s/ Daniel M. Silver
                                                     Daniel M. Silver (#4758)
Leigh J. Martinson                                   Alexandra M. Joyce (#6423)
Leah R. McCoy                                        Renaissance Centre
MCCARTER & ENGLISH, LLP                              405 N. King Street, 8th Floor
265 Franklin St.                                     Wilmington, Delaware 19801
Boston, MA 02110                                     (302) 984-6300
(617) 449-6500                                       dsilver@mccarter.com
lmartinson@mccarter.com                              ajoyce@mccarter.com
lmccoy@mccarter.com

                                                     *Attorneys for Plaintiff*
                                                     *Teratech, Corp. d/b/a Terason*